UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

JOAO CORCINO,
Defendant.

19-CR-901 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Defendant Joao Corcino is charged with participating in a conspiracy to distribute controlled substances, specifically methamphetamine and hydroxybutyric acid ("GHB"), in violation of 21 U.S.C. § 841(a)(1). He moves to suppress evidence that DEA agents seized from his home and statements that he made to the DEA agents in October 2019. The motion has been fully briefed (Dkt. Nos. 10–12, 18), and this Court conducted an evidentiary hearing on August 4, 2021.

## I. Background

The following facts are established by the criminal complaint (Dkt. No. 1), the testimony of DEA Special Agent Richard Lavorato, and the exhibits received in evidence.

In August 2019, DEA agents arrested two individuals outside of 615 West 173rd Street as a part of an investigation into a drug trafficking organization distributing methamphetamine and GHB. These two individuals possessed approximately two kilograms of methamphetamine. The arrested individuals told the DEA agents that they were supposed to give the drugs to someone inside the building named "El Viejo." The DEA agents found a contact for "El Viejo" in each arrestee's phone; a subpoena of the phone number and records for "El Viejo" traced back to Joao Corcino, whose listed address was 615 West 173rd Street.

On October 7, 2019, three DEA agents were surveilling Corcino's building when the superintendent of 615 West 173rd Street informed them that Corcino was in the lobby. All three DEA agents entered the building and approached Corcino. After identifying themselves as law enforcement, the DEA agents asked Mr. Corcino if he lived in the building and for identification. Corcino answered that he lived in the building and showed his passport to the agents. The DEA agents next asked Mr. Corcino for proof that he lived in the building. Corcino went over to his mailbox in the lobby and opened it to retrieve a piece of mail with his name on it to show to the agents, but his mailbox was empty. Corcino then remarked that he had mail with his name on it upstairs in his apartment and offered to go upstairs to get it. The agents in response asked Corcino if they could go upstairs with him and Corcino agreed.

When Corcino arrived at the door of his apartment, he used his key to open the door and then tried to close it behind the agents. The agents asked Corcino to keep the door open for their safety and Corcino obliged. Agent Lavorato testified that from the hallway the agents were able to see a "meth pipe" inside a bedroom. (Tr. 14.) The agents were able to see into the bedroom from the hallway because the bedroom door was not on its hinges. (Tr. 18.) The agents then asked if they could enter the apartment to look at the pipe, which Corcino agreed to according to Agent Lavorato. (Tr. 14.) Once inside the bedroom, the agents were able to see more methamphetamine in a glass tray on a windowsill, as well as a "big brown box" on top of a dresser. (Tr. 14.) The agents opened the box and found "20 or 30 canisters" of GHB. (Tr. 14.) After finding the methamphetamine and GHB, the agents asked Corcino several questions about the drugs. Corcino made several comments in response, including that the methamphetamine was for personal use and that the GHB was used for sexual enhancement. (Tr. 14.) One of the agents then left the apartment to obtain a consent form to search the remainder of Corcino's

apartment; Corcino signed the consent form (*See* Dkt. No. 18, Ex. 2). Corcino proceeded to tell the officers that there was methamphetamine in his bedroom closet (Tr. 16), which the agents then searched. The agents found more than a kilogram of methamphetamine in the closet. (Tr. 84.) After seizing the methamphetamine, the agents arrested Corcino and read him his Miranda rights. (Tr. 18–19.)

## II. Discussion

Corcino argues that the agents "effectuated a *de facto* arrest" in his lobby without probable cause. (Dkt. No. 12 ¶ 6.) So, in Corcino's view, all the evidence that the agents subsequently seized should be excluded, as well as any statements Corcino made to the agents. Corcino also contends that the evidence the officers seized should be excluded because they did not have a warrant to search his apartment. Additionally, Corcino moves to suppress statements he made to DEA agents as they searched his apartment because he was not given a *Miranda* warning, he did not make his statements voluntarily, and he did not have counsel present. The Court addresses each of these arguments in turn.

### A. Arrest of Corcino

"A seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained." *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009). An officer "approach[ing] an individual and ask[ing] a few questions" is not a seizure "[s]o long as a reasonable person would feel free to 'disregard the police and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).

The Court concludes that Corcino was not seized until he was formally arrested in his apartment after DEA agents found more than a kilogram of methamphetamine in his closet. DEA agents first approached Corcino in the lobby of his apartment building and asked him a

series of questions, something both parties recognize was an investigatory stop. Corcino asserts, however, that this investigatory stop "ripen[ed into a *de facto* arrest." (Dkt. No. 12 ¶ 6.) But the case Corcino relies upon for this argument, *United States v. Perea*, 986 F.2d 633 (2d Cir. 1993), undermines his position. The agents did not "unreasonably use[] means of detention that were more intrusive than necessary" — they neither restrained "[Corcino's] freedom of movement" nor engaged in any "physical treatment of [Corcino]." *Id.* at 644–45. Corcino still argues that he was not permitted to leave despite the officers not ordering him to stop or physically restraining him, and notes that he was outnumbered by the three agents. But the "number of officers on the scene would not, by itself, have led a reasonable person in [Corcino's] shoes to conclude that he was in custody." *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004).

Moreover, Corcino's subsequent actions after the agents questioned him in the lobby were not consistent with someone who did not "feel free to 'disregard the police and go about his business.'" *Bostick*, 501 U.S. at 434 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Corcino twice attempted to end his interaction, at least temporarily, with the agents. After the agents first approached him in the lobby and asked for identification, Corcino testified that he told the agents to wait in the lobby while he retrieved mail from his apartment. (Tr. 61.) Though the officers followed him into the elevator and to his apartment door, according to Corcino, he again told the officers to wait, this time outside of his apartment door, as he went into his apartment. (Tr. 62.) It was only after the DEA agents found methamphetamine in Corcino's closet, after Corcino signed a consent to search form, that he was placed under arrest. Because there was not an unlawful seizure, the Court denies Corcino's motion to suppress evidence and statements on this ground.

**B. Search of Corcino's Apartment**

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Law enforcement may enter and search a residence without a warrant, however, if an individual voluntarily consents to their entry and the individual is authorized to give this consent. *See United States v. Matlock*, 415 U.S. 164, 171 (1974). Whether consent to enter a residence was voluntarily given, "and not the result of duress or coercion, express or implied," *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973), is a fact-based inquiry that must be determined by the "totality of all of the circumstances," *id.* at 227. This fact-based inquiry "is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to" enter and search the residence. *Florida v. Jimeno*, 500 U.S. 248, 249 (1991).

The Court concludes that the DEA agents validly entered Mr. Corcino's home. After Corcino left his apartment door open as the agents requested, Agent Lavorato testified that the agents standing in the hallway could see what looked like a meth pipe inside a bedroom. Seeing the meth pipe prompted the agents to ask "[Corcino] if he minded if [the agents] came in and [took] a look and [Corcino] said no." (Tr 14.) The totality of circumstances suggests that Corcino voluntarily consented: he was neither in custody nor in handcuffs when he consented, there was no show of force by the agents, and the agents did not tell Corcino a warrant would be obtained or otherwise deceive him about their right to enter. *See United States v. Lavan,* 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (collecting cases on the circumstances to consider in assessing whether a search was validly consented to). The only factors that potentially cut in Corcino's favor — that he may not have known he could refuse consent and that the agents failed to tell him he could refuse to consent — "are not in and of themselves determinative." *Bustamonte*, 412 U.S. at 227; *see also id.* ("While knowledge of the right to refuse consent is one

factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").

The Court does not find Corcino's version of events, in which he repeatedly told the agents that they could not enter his home and never consented to their entry, to be credible. "It is within the province of the district court as the trier of fact whose testimony should be credited." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012). An adverse credibility determination is "appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony." *United States v. Lawson*, 961 F. Supp. 2d 496, 504 (W.D.N.Y. 2013) (quoting *Diallo v. I.N.S.*, 232 F.3d 279, 287–88 (2d Cir. 2000)). Corcino offered both inconsistent statements and inherently improbable testimony during the suppression hearing. Sometime after the agents entered Corcino's home, Corcino signed a consent-to-search form that the agents gave him. Corcino claimed that he could not read the consent-to-search form because he did not have his glasses on. (Tr. 67, 76.) This consent-to-search form contained printed text and Corcino's address handwritten in pen; critically, the handwritten address is not significantly larger than the printed text on the form. (*See* Dkt. No. 18, Ex. 2.) Yet, despite his claim that he could not read the consent to search form without his glasses, Corcino asserted on cross-examination that his address was not on the form when he signed it. Corcino offered additional inherently improbable testimony: on cross-examination, he claimed for the first time that at an agent threatened to hit him with a flashlight. (Tr. 85.) Corcino never spoke of this threat on direct examination or re-direct examination, and he did not include this alleged threat in his suppression motion. For these reasons, the Court does not credit his account of how the agents entered his home.

The Court now turns to the admissibility of what the police seized once inside of Corcino's apartment.

**1. Methamphetamine and Pipes in the Bedroom**

The officers validly seized the pipe and methamphetamine inside of Corcino's bedroom. "The 'plain view' exception authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *United States v. Gamble*, 388 F.3d 74, 76 (2d Cir. 2004) (internal quotation marks omitted). Corcino consented to the agents' request to enter the apartment and take a look at the pipe. Once the agents were inside the bedroom where the pipe was located, they observed methamphetamine on the windowsill. Since both objects were in plain view, and the officers were validly inside Corcino's bedroom, the Court denies Corcino's motion to suppress this evidence.

**2. GHB**

The agents exceeded the scope of the consent search, however, when they opened a box in Corcino's bedroom that contained GHB. The Court concludes that Corcino's consenting to the agents entering his bedroom to examine the pipe could not reasonably be understood to extend to searching through his other belongings. *See Horton v. California*, 496 U.S. 128, 140 (1990) (holding that "[i]f the scope of the search exceeds that permitted by the terms of a . . . relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more"). Unlike the methamphetamine on the windowsill, the GHB was not in plain view since the agents had to open the box to find it, and the agents did not have probable cause to believe the box contained contraband. *See Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987) (holding that an officer moving a stereo to look at the bottom of it was a search that required probable cause since it went beyond "the objectives of the authorized intrusion" into the

suspect's home). That Corcino signed a consent-to-search form after the officers impermissibly searched the box does not change the analysis here. *See United States v. Wilson*, 914 F. Supp. 2d 550, 564 (S.D.N.Y. 2012). The Court thus excludes the GHB seized by the agents.

**3. Methamphetamine in the Closet**

The last item that the agents seized, about a kilogram of methamphetamine from Corcino's closet, is admissible because of the consent-to-search form that Corcino signed. Agent Lavorato testified that the agents asked Corcino if he read English, Corcino answered that he did, and then Agent Lavorato witnessed Corcino read the form and sign it. (Tr. 16.) The form gave the agents permission to search Corcino's entire apartment. (See Dkt. No 18, Ex. 2.) Since the search that uncovered the kilogram of methamphetamine took place after Corcino signed the form, the search and subsequent seizure were permissible.

**C. Corcino's Statements During the Search**

The Court also denies Corcino's motion to suppress statements he made to agents while they searched his home. Corcino argues that he was subjected to a custodial interrogation without being advised of his *Miranda* rights, that his statements were not voluntary, and that his statements were impermissibly taken without counsel present. Each argument is meritless. *Miranda* warnings must be given when an individual is in custody before police officers can question the individual. Custody for *Miranda* purposes "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). Courts have held that a suspect is not in custody when police officers order the suspect to stay in a room while the officers execute a valid search and the suspect is not under arrest. *See, e.g.*, *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003). Moreover, "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *United States v. Newton*, 369 F.3d 659, 675 (2d Cir.

2004). During the search in this case, Corcino sat on a bed in the second bedroom of his apartment. (Tr. 18.) As previously discussed, Corcino was not under arrest before this search took place. Further, the officers did "not physically or verbally indicate[] to [Corcino] that he was not free to leave," so "none of the statements [Corcino] made in the [apartment] were made while in custody." *Campaneria v. Reid*, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989). The agents were thus not required to give Corcino a *Miranda* warning and his statements during the search are admissible.

Also, in considering the "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials," *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988), the Court finds that none of these considerations support suppressing Corcino's statements. Corcino is an adult of sound mind who speaks and understands English; he was questioned by agents while in his own home; and the agents did not engage in "repeated and prolonged" questioning of Corcino or employ "psychologically coercive techniques, "physically mistreat[] Corcino, subject Corcino to "long restraint in handcuffs," or "depriv[e] [Corcino] of food, water, or sleep," *id.* at 902. Finally, Corcino's Sixth Amendment rights were not violated when the agents questioned him without counsel present since his right to counsel had not attached. *See Rothgery v. Gillespie Cty.*, 554 U.S. 191, 198 (2008) (noting that the right to counsel attaches upon the "initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" (internal quotation marks omitted)).

## III. Conclusion

For the foregoing reasons, Defendant Corcino's motion to suppress is GRANTED with respect to the GHB seized and DENIED with respect to the pipe and methamphetamine seized and the statements Corcino made to the agents.

The Clerk of Court is directed to close Docket Number 10.

SO ORDERED.

Dated: October 27, 2021
New York, New York

J. PAUL OETKEN
United States District Judge